FILED
CLERK

7/12/2023 4:42 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
UNITED STATES OF AMERICA,

      -against-                  SUPERSEDING ORDER[1]
                                      05-CR-0301(JS)

FREDERICK AMERSON,

                Defendant.
-------------------------------------X

APPEARANCES

For Defendant:     Elizabeth E. Budnitz, Esq.
                 185 Hall Street, No. 314
                 Brooklyn, New York  11205[2]

For United States: Charles P. Kelly, Esq.
                 United States Attorney's Office
                 Eastern District of New York
                 610 Federal Plaza
                 Central Islip, New York  11722

---

[1] On July 7, 2023, the Government requested that the Court amend its Order issued on July 6, 2023 granting Defendant's subject motion. (See Letter Mot. to Amend, ECF No. 122, at 1 (arguing "[b]y granting both a Compassionate Release Motion and a Sentence Reduction to 20 years, the Order creates a problem of overserved time. Essentially, if defendant commits crimes on supervised release, he would have an overserved credit to offset any sentence received on the [violation of supervised release]").) It requested the Court amend the July 6, 2023 Order at page 33 to read: "Defendant's Compassionate Release Motion is granted to the extent that Defendant's sentence of imprisonment is reduced to time served plus 14 days and thereafter, the original three-year period of supervised release shall commence." (See id.) On July 12, 2023, Defendant filed a response stating he does not object to the suggested change in language sought by the Government. (See Response, ECF No. 123.) By separate order, the Court grants the Government's Letter Motion to Amend. This Superseding Order incorporates the Government's requested language change, with related corresponding amendments, and supersedes the July 6, 2023 Order (ECF No. 121).

[2] As a courtesy, the Court is listing the address provided in pro bono Attorney Budnitz's latest filings. However, this address is not Counsel's address-of-record. Counsel is advised to update her current address-of-record, if necessary.

SEYBERT, District Judge:

Currently before the Court is the counseled motion of Defendant Frederick Amerson ("Defendant") seeking compassionate release or a sentence reduction (hereafter, the "Motion"). (See Motion, ECF No. 111; see also Reply, ECF No. 116; Suppl. Motion, ECF No. 117; Med. Update, ECF No. 119.) The Government opposes the Motion. (See Opp'n, ECF No. 114; see also Med. Update Response, ECF No. 120.) For the reasons that follow, the Motion is GRANTED.

RELEVANT BACKGROUND

I.   Defendant's Underlying Conviction

After serving 10 years in New York and New Jersey prisons for a series of robberies, sometime in 2003 or 2004, Defendant resumed his criminal activities. (See Motion at 2-3.) Defendant again engaged in a criminal spree involving more than a dozen robberies, including the armed robbery of two different commercial establishments on Long Island with a .38 caliber Smith & Wesson revolver. (See Superseding Indictment, ECF No. 9; Opp'n at 1.) He was arrested on January 26, 2005. (See Motion at 4.)

The Government indicted Defendant on April 14, 2005. (See Indictment, ECF No. 1.) A 17-count Superseding Indictment was brought against Defendant on August 3, 2005. (See Superseding Indictment, ECF No. 9.) On February 21, 2007, Defendant pled

guilty to two counts of brandishing a firearm during a crime of violence, to wit, Hobbs Act robbery. (See Minute Entry, ECF No. 69 (Criminal Cause for GUILTY PLEA); see also Judgment, ECF No.81, Counts 11 and 13 (Judgment dated Nov. 2, 2007, and entered Jan. 2, 2008).) On November 2, 2007, the Honorable Arthur D. Spatt sentenced Defendant to, inter alia, 32 years' imprisonment, with Judge Spatt directing that Defendant be given credit for time already served since January 26, 2005. (See Minute Entry of Sent'g Hr'g, ECF No. 83; Judgment at 2.)

Defendant is currently serving his sentence at FCI Seagoville in Seagoville, Texas. (See Opp'n at 1); see also Fed. Bureau of Prisons ("BOP"): Find an Inmate, Frederick Amerson (BOP Reg. No. 26945-050) (identifying Defendant's location as "Seagoville FCI"), https://www.bop.gov/inmateloc/ (last visited June 29, 2023). He has a scheduled release date of May 3, 2032. See id.

II. Relevant Procedural History

Defendant originally moved for compassionate release or a sentence reduction on March 13, 2021, during the height of the COVID-19 Pandemic. (See Motion.) After the Government's opposition thereto, Defendant supplemented his Motion on December 31, 2021. (See Suppl. Motion.) At this Court's behest,[3] Defendant

---

[3] Prior to January 3, 2022, this case was before the Honorable Joan M. Azrack. (See Order of Recusal, ECF No. 118.)

also filed an update regarding his medical conditions, to which the Government filed a response.  (See Med. Update; Med. Update Response.)

DISCUSSION

I.   Applicable Law

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute."  United States v. Rabuffo, No. 16-CR-0148, 2020 WL 2523053, at *1 (E.D.N.Y. May 14, 2020) (quoting United States v. Gotti, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020)).  The First Step Act, which modified 18 U.S.C. § 3582(c), allows a court to modify a defendant's sentence upon a motion of either (i) the Director of the BOP, or (ii) the defendant "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A); see also United States v. Thrower, 495 F. Supp. 3d 132, 137 (E.D.N.Y. 2020).  "The statute imposes three independent, necessary requirements for release: exhaustion of remedies, existence of an extraordinary and compelling reason for sentence reduction, and that the § 3553(a) factors warrant reduction."  United States v. Hunter, No. 21-1773, 2022 WL 2288688, at *1 (2d Cir. June 24, 2022) (citing United States v. Keitt, 21 F.4th 67, 71 (2d Cir. 2021) (per curiam)).  "A

defendant's failure to exhaust administrative remedies is a threshold matter preventing the [c]ourt from considering a Section 3582 application[, _i.e._, a motion for compassionate release]." United States v. Robinson, No. 10-CR-0789, 2022 WL 16924176, at *3 (E.D.N.Y. Nov. 14, 2022) (quoting United States v. Alvarez, No. 89-CR-0229, 2020 WL 4904586, at *2 (E.D.N.Y. Aug. 20, 2020)); see also United States v. Torres, No. 16-CR-0500, 2022 WL 538323, at *2 (S.D.N.Y. Feb. 23, 2022) ("Before a compassionate-release motion can be considered on the merits, the defendant must exhaust administrative remedies." (quoting United States v. Williams-Bethea, 464 F. Supp. 3d 562, 565 (S.D.N.Y. 2020)). And, "[i]f any one requirement is not satisfied, the district court may deny the motion without considering the remaining requirements." Hunter, 2022 WL 2288688, at *1 (citing Keitt, 21 F.4th at 72-73).

Where exhaustion is satisfied, in their consideration of motions brought pursuant to the First Step Act, courts are not restricted to the Sentencing Commission's applicable policy statements, but may consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020); see id. at 236 (finding that "[b]ecause Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants [as compared to those brought by the BOP], Application Note 1(D) cannot

constrain district courts' discretion to consider whether any reasons are extraordinary and compelling"[4]); see also Keitt, 21 F.4th at 71 ("A court deciding a compassionate release motion can consider 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it].'" (alteration in original) (quoting Brooker, 976 F.3d at 237)); United States v. Souza, No. 20-3829, 2021 WL 3871262, at *1 (2d Cir. Aug. 31, 2021) ("[T]he Sentencing Commission's policy statements do not 'constrain district courts' discretion to consider whether any

---

[4]  In accordance with this Second Circuit instruction regarding 18 U.S.C. § 3582(c)(1)(A), the compassionate release provision, Chief Judge Brodie recently noted:

> "The statute sets out a fourth requirement: that the 'reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" United States v. Keitt, 21 F.4th 67, 71 n.2 (2d Cir. 2021) (per curiam) (quoting 18 U.S.C. § 3582(c)(1)(A)). However, the Second Circuit has "held that, at present, the policy statement governing compassionate release — U.S.S.G. § 1B1.13 — governs only motions brought by the Director of the Bureau of Prisons, not those brought directly by inmates." Id. (citing United States v. Brooker, 976 F.3d 228, 236–37 (2d Cir. 2020)).  The Sentencing Commission recently proposed an amendment to U.S.S.G. § 1B1.13 to reflect that 18 U.S.C. § 3582(c)(1)(A) authorizes a defendant to file a motion seeking a sentence reduction . . . . The proposed amendments are currently undergoing a notice-and-comment period.

United States v. Guzzo, No. 95-CR-0754, Redacted Memo & Order (ECF No. 538), at 5 n.7 (E.D.N.Y. May 18, 2023).

reasons are extraordinary and compelling.'" (quoting Brooker, 976 F.3d at 236)).  Rather, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'"  Brooker, 976 F.3d at 237-38 (emphasis and alteration in original) (quoting 28 U.S.C. § 994(t)); see also Ambrosio, 541 F. Supp. 3d at 254 (same). "Additionally, district courts may consider 'intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act.'"  United States v. Monteleone, No. 92-CR-0351, 2023 WL 2857559, at *2 (E.D.N.Y. Apr. 10, 2023) (quoting Concepcion v. United States, 142 S. Ct. 2389, 2404 (2022)).

Even where extraordinary and compelling reasons exist, the Court must "consider all the Section 3553(a) [F]actors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) [F]actors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."  United States v. Davies, No. 17-CR-0057, 2020 WL 2307650, at *2 (E.D.N.Y. May 8, 2020) (citation omitted); see also Ambrosio, 541 F. Supp. 3d at 254 (same); United States v. Reid, No. 05-CR-5596, 2021 WL 837321, at * 4 (E.D.N.Y. Mar. 5, 2021) ("Even if extraordinary and compelling reasons exist, they must outweigh the [Section] 3553(a)

[F]actors to warrant sentence reduction." (citing 18 U.S.C. § 3582(c)(1)(A))). "The defendant bears the burden of showing that the circumstances warrant a sentence reduction." United States v. Sellick, No. 21-2328, 2022 WL 16936829, at *1 (2d Cir. Nov. 15, 2022) (summary order) (citing United States v. Jones, 17 F.4th 371, 375 (2d Cir. 2021); see also United States v. Friedlander, No. 20-CR-0441, 2022 WL 2305370, at *3 (E.D.N.Y. June 24, 2022) ("A defendant 'bears the burden of showing that his release is justified.'" (quoting United States v. Patterson, No. 06-CR-0080, 2020 WL 3451542, at *1 (S.D.N.Y. June 23, 2020)).

II. Application

    A. The Parties' Positions

        Pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) (the "First Step Act" or the "Act"), Defendant moves for compassionate release and/or the reduction of his 32-year sentence arguing that, given his advanced age (66-years-old) and various health issues (i.e., Type II Diabetes, obesity, hypertension, and asthma), he is "among those most at risk of dying from COVID-19". (Motion at 8; see also id. at 12 ("Mr. Amerson's serious medical conditions of obesity, hypertension, Type 2 diabetes, and asthma necessitate his early release or reduction in sentence because of the dangers of the Covid-19 pandemic.").) Moreover, he contends that it is of no moment that he "has contracted and recovered from Covid-19," since "this in no way

protects him from reinfection." (Id. at 12.) Similarly, Defendant's receipt of the COVID-19 vaccine "only confers partial protection, and likely will not protect [him], with his significant co-morbidities, against new variants that have been detected worldwide, and in the United States." (Id. at 13; see also id. at 15 (acknowledging that cases at Seagoville FCI have lessened, but arguing the "possibility of another flare up of cases is always present"), and at 17 (arguing further that "the long-term effects of contracting [COVID-19] may affect [Defendant's] pre-existing conditions").) In addition, Defendant argues that his BOP incarceration "during the pandemic has been harsh enough that, especially in light of [his] medical issues[,] the cruel nature of confinement during the pandemic itself presents another extraordinary and compelling reason for [his] release." (Id. at 18.) Relatedly, Defendant contends "[t]he psychological toll of feeling helpless to protect oneself against COVID-19 infection, as well as the nature of confinement during the pandemic, has made [his] incarceration . . . much more brutal than it would have been otherwise" leading to "a sufficiently extraordinary and compelling combination of circumstances to weigh in favor" of the Court granting him release. (Id. at 19 (quoting United States v. Henareh, No. 11-CR-0093, 2021 WL 119016, at *4 (S.D.N.Y. Jan. 13, 2021)).) Indeed, when Defendant initially moved for compassionate release or a sentence reduction, it was "reported that 75% of the

inmates [at FCI Seagoville] ha[d] tested positive for Covid-19, and 28 of the 300 staff members also tested positive, making it one of the hardest-hit federal prisons in the United States." (Id. at 21 (footnoted omitted); see also id. at 22 (discussing Defendant's inability to socially distance at FCI Seagoville and the Facility's lack of cleaning protocols).)  Defendant asserts numerous courts throughout the country have granted FCI Seagoville inmates with underlying health issue compassionate release in light of BOP's "abject failure" to protect inmates from COVID-19. (Id. at 23-24 (collecting cases).)

Defendant also advances the position that the length of his sentence compared to other sentences for the same crime demonstrates an extraordinary and compelling reason to reduce his sentence, if not to outrightly grant him compassionate release. (See id. at 24.)  Relatedly, Defendant puts forth a "stacking" argument, claiming that if he were sentenced today, he would not be subject to the excessively long sentence imposed upon him. (See id. at 25.)  He also offers a collection of other cases where courts have granted defendants compassionate release for more serious crimes than those committed by Defendant. (See id. at 25-26 (collecting cases).)

Finally, recognizing that rehabilitation alone does not justify compassionate release, Defendant argues that it can be considered in conjunction with other factors in granting a motion

under the First Step Act.  (See id. (citing United States v. Phillips, 469 F. Supp. 3d 180, 185 (S.D.N.Y. 2020)).)  In that vein, Defendant highlights his model inmate status as exemplified by having "zero disciplinary infractions."  (Id. (emphasis in original).)  Moreover, Defendant has: "taken every class available to him"; participated in a six-month drug and alcohol addiction program; taken numerous religious classes through a correspondence school; adopted daily meditation; taken full responsibility for his crimes for which he is remorsefully sorry; and, a low risk-of-recidivism score.  (Id. at 27-28.)  Additionally, Defendant claims he "is simply not any danger to society" given his advanced diabetes, which: causes muscle weakness and difficultly ambulating; requires the use of a cane; and, precludes his climbing stairs.  (See id. at 29.)  If released, Defendant has "a significant amount of money from his deceased mother," which will be immediately available to Defendant to assist him in re-establishing himself in society.  (See id.)

In his Reply, Defendant expands his rationale for a reduced sentence, i.e., that his "feet are clinically swollen" and that "he uses two different inhalers for his asthma."  (Reply at 6.)  He also asserts that, notwithstanding being vaccinated, because of his co-morbidities, he remains at a heightened risk of being infected by a COVID-19 variant.  (See id. at 2.)  Further, recognizing the seriousness of his crimes, Defendant nonetheless

asserts that "[i]n light of the harsh conditions in prison" as a result of the Pandemic, and his "increased risk of severe illness, additional years in prison would not serve the interest of justice." (Id. at 7.)  If released, Defendant offers that "[t]here are less risky ways to monitor [him] and assure the safety of the community through any number of supervised release conditions, including electronic monitoring."  (Id.)

In his Supplemental Motion, Defendant advances a fine-tuned argument:  As an inmate who is more than 60-years-old and who is severely disabled, every day he "spends in prison as the [P]andemic rages on is a day of harsher punishment than originally expected." (Suppl. Motion at 9.)  His statement is premised upon, inter alia: the-then high COVID-19 infection rate at Seagoville FCI; the fact that the Facility was operating at the highest restriction levels because of COVID-19; inmates' inabilities to adequately protect themselves, e.g., being unable to frequently wash their hands and/or socially distance; and, heightened dangers caused by understaffing precipitated by ramped COVID-19 infections among the staff.  (See id. 6-9.)

According to his Medical Update, Defendant's "health has significantly declined." (Med. Update at 1.)  As of the end of September 2022, Defendant's medical diagnosis included, inter alia: Type II Diabetes, Hyperlipidemia, Polyneuropathy in Diabetes, Difficulty in Walking, Hypertension, Asthma, Nocturia,

Fasciitis, and a Body Mass Index of 29.6.  (Id. at 2.)  The Facility's medical staff also noted Defendant's: "'10-year history of worsening bilateral leg weakness and numbness [which has] worse[ned] over the last year,' with him exhibiting 'weakness' and 'motor deficit'"; "[d]ifficulty in walking"; using a cane to walk; having had to also use a walker; and, requiring medical shoes. (Id.)  Moreover, Defendant contends he has experienced "four hypoglycemic events where [he] came close to dying," with one episode resulting in him being transported to an outside hospital emergency room.  (Id.)  Defendant claims this is the result on his limited abilities in prison to check his glucose levels.  (See id. at 2-3.)

In opposition, the Government posits primarily: (1) that since Defendant has been vaccinated against COVID-19, he does not present an extraordinary and compelling reason for relief; (2) Defendant presents a danger to the community; and (3) a substantial amount of time remains on his sentence.  (Opp'n at 1.)  In support of its position, the Government asserts the BOP made aggressive efforts to implement procedures at FCI Seagoville to reduce the spread and exposure of the Virus and that infection rates at the Facility are currently minimal.  (See id. at 3.)  It further points out that "[D]efendant had COVID-19, recovered from minimal symptoms[,] and is now fully vaccinated."  (Id.)  Moreover, the Government maintains Defendant's situation does not comport with

the Sentencing Guidelines policy statements regarding extraordinary and compelling circumstances, especially as Defendant was not yet 65-years-old (at the time of its Opposition) or the primary caregiver for any other person, and his medical conditions do not arise to the serious level contemplated under the Guidelines. (See id. at 4 (citing U.S.S.G. § 1B1.13, app. Note 1); see also id. at 5 (asserting "[D]efendant presents risk factors of controlled diabetes, mild asthma, hypertension and obesity" but "has been vaccinated"); id. at 7 (asserting Defendant's vaccinated status counsels against finding an extraordinary circumstance presented); see also Med. Update Response at 2 (arguing "defendant has his chronic health conditions under control", "defendant is able to keep his diabetes in check by taking insulin and ensuring that he eats all meals", and "defendant is able to properly keep his diabetes in check by adhering to his treatment plan"; and relying upon United States v. Bailey, No. 97-CR-0269, 2021 WL 4942954, at *1-2 (S.D.N.Y. oct. 22, 2021) (holding 69-year-old defendant did not have extraordinary and compelling reason for compassionate release because he was fully vaccinated against COVID-19 and his medical records indicated his chronic health conditions were well-controlled)).)

        As to the Section 3553(a) Factors, the Government underscores Defendant's violent criminal history, basing its

arguments upon the 2007 Presentence Report prepared in this case. (See id. at 8-9.)  It contends Defendant is "a lifelong recidivist" who "continues to present a danger to the community."  (Id. at 10 (asserting further that Defendant's "age and medical condition would not compromise his ability to recruit a willing participant to commit or assist him in committing violent acts on his behalf").)  Finally, the Government maintains that the reduction in sentence that Defendant seeks "would completely undermine the deterrent effect of such a lengthy sentence, and would allow the [D]efendant to escape the justified punitive sanction imposed . . . for his crimes." (Id.; see also Med. Update Response at 2 (same).)

    B.   Exhaustion

It is undisputed that Defendant has exhausted his administrative remedy by having requested of the Warden compassionate release, which request was denied.  (See Opp'n at 2.)  Having satisfied this threshold requirement, the Court continues to determine whether Defendant has met his burden of showing entitlement to compassionate release or a reduction of sentence.

    C.   Existence of Extraordinary and Compelling Circumstances

Here, no one factor presented by Defendant warrants the finding of extraordinary and compelling circumstances; however, considered in conjunction, Defendant's circumstances arise to

extraordinary and compelling levels.  See United States v. Russo, No. 92-CR-0351, -- F. Supp. 3d --, 2022 WL 17247005, at *6 (E.D.N.Y. Nov. 28, 2022) (finding the combined consideration of extraordinary rehabilitation and COVID-19-related issues, including the harshness of confinement caused by the Pandemic, rose to the level of extraordinary and compelling circumstances).

As to COVID-19:  "Since the decline of COVID-19 cases and proliferation of vaccines, courts in this Circuit have generally rejected compassionate release motions based on the threat posed by the virus, asserting that 'the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors.'"  United States v. Johnson, No. 16-CR-0319, -- F. Supp. 3d --, 2023 WL 3093617, at *10 (E.D.N.Y. Apr. 26, 2023) (quoting United States v. Oquendo, No. 13-CR-0357, 2023 WL 199609, at *4 (S.D.N.Y. Jan. 17, 2023)) (emphasis added).  "In evaluating whether an individual's current risk from the pandemic warrants compassionate release, courts have examined their vaccine status, the COVID-19 situation at their specific correctional facility, and whether their co-morbidities are being managed."  Id. (citations omitted).  Courts further recognize that:  "being fully vaccinated does not completely eliminate the risk and danger of contracting COVID-19, as variants, breakthrough infections, and infections rates have risen," United States v. Watts, No. 92-CR-0767, 2023 WL 35029, at *9 (E.D.N.Y.

Jan. 4, 2023); "recent variants may spread 'more easily and can cause reinfection among vaccinated individuals,'" United States v. De Vargas, No. 08-CR-0115, 2023 WL 2787845, at *5 (E.D.N.Y. Apr. 4, 2023) (quoting Mayes v. United States, No. 12-CR-0385, 2023 WL 22632, at *4 (E.D.N.Y. Jan. 3, 2023)); but, such variants are "considered less severe in causing illness and death." Mayes, 2023 WL 22632, at *4.

At the time of his first submission seeking compassionate release, Defendant was 64-years-old, suffered from well-documented and significant health issues, including Type II diabetes (causing clinically swollen feet, requiring Defendant to walk with a cane, and preventing him from climbing stairs), obesity, hypertension, and asthma (requiring the use of two inhalers, one of which is steroid-based and compromises his immune system). (See Motion at 8.) He argued his age together with his comorbidities "put him at a great risk of severe illness or death from Covid-19." (Id.)

In opposition, the Government highlighted the reason for three of Defendant's four diabetic hypoglycemia episodes was that Defendant had skipped meals. (See Med. Update Response at 2.) The implication is that if Defendant does not skip meals, he will not suffer such an episode; thus, according to the Government, "[D]efendant is able to properly keep his diabetes in check by adhering to his treatment plan." (Id.) In turn, Defendant's

diabetes does not constitute an 'extraordinary and compelling' reason warranting compassionate release." (Id.) The Court is unpersuaded.

In his latest submission to the Court, Defendant writes that in addition to the four diabetic hypoglycemia episodes – during which, according to Defendant, he came close to dying and which the Government asserts were attributable to skipped meals – he suffers other, hypoglycemia episodes "in the middle of the night when [the guards] do the count and I'm yelling and moaning because I need help . . . [and] know something is wrong but [I] can't figure out what to do in that condition." (Amerson Letter, Ex. BB, ECF No. 119-3, at 1, attached to Med. Update.) When this occurs, Defendant asserts a guard will give him glucose tabs to stabilize him. (See id.) Yet, of significance, Defendant states "there is no medical [staff] here from 7:30 PM to 6:00 AM." (Id.) Moreover, inmates are permitted to test their blood sugar levels only twice daily, which Defendant contends is insufficient; he maintains that if he were not incarcerated and had private medical insurance, he would be covered for blood sugar testing four times a day, but would self-test six times daily. (Id. at 1-2.) Defendant contends that his Type II diabetes is causing serious deterioration in his physical health and, because of his age, has "become progressively more difficult to control." (Id. at 2.) He is required to take daily medication, wear compression socks, and

elevate a portion of his bed to prevent his legs from swelling. (Id.) Additionally, medical records from August through October 2022 reflect Defendant: has a "10-year history of worsening bilateral leg weakness" which is "progressively getting worse" and which is adversely affecting his balance; requires a walker, a cane, and medial shoes; lacks the ability to heel-to-toe walk or stand on one leg for very long; and, has experienced "lower back pain for years" which is "getting worse." (Med. Update at 1-2.)

Here, Defendant has been vaccinated (see Reply at 2; Suppl. Motion at 2, 7; Opp'n at 5), but still contracted COVID-19, albeit suffering mild symptoms. (See Opp'n at 3, 7; see also id. at 12, 17.) Further, although the COVID-19 situation at FCI Seagoville had been very serious, especially while Defendant's Motion has been pending (see Motion at 21-22), currently that Facility is operating at BOP COVID-19 Operational Level 1, the BOP's lowest operational level, meaning the medical isolate rate is less than 2% and new community positive cases are less than 100 per 100,000 over the last seven days. See BOP FCI Seagoville Home Pag, available at https://www.bop.gov/locations/institutions/sea/ (indicating Facility's current Operational Level is Level 1) (last visited June 6, 2023); see also BOP COVID-10 Modified Operations Plan & Matrix, available at https://www.bop.gov/coronavirus/covid19_modified_operations_guid e.jsp ("provid[ing] a general overview about BOP COVID-19

Operation Levels: how they are determined, how operations are affected, and related resources") (last visited June 6, 2023). These factors mitigate against granting compassionate release. However, the Court must also consider whether Defendant's co-morbidities are being well-managed.  That prong of the analysis gives pause to the Court's consideration.

Even accepting the Government's "skipping meals" explanation as the reason for a few of Defendant's hypoglycemia episodes, given the Facility's lack of medical care from early evenings to early mornings and during which timeframe Defendant has experienced concerning symptoms from fluctuating blood sugar levels requiring him to rely upon guards to give him glucose tablets, as well as his limited ability to test his blood sugar levels, the Court questions whether Defendant is able to provide the necessary self-care needed to manage his Type II diabetes. Relatedly, Defendant's more recent medical records indicate that his health conditions are deteriorating because of his diabetes, a chronic health conditions, thereby raising concrete concerns whether his Type II diabetes is well-controlled.  This does not take into consideration the Defendant's other co-morbidities. Still, as he has weathered the worst of COVID-19, having contracted it and recuperated from it, Defendant's fears arising from COVID-19 (compounded by his co-morbidities) is not enough, by itself, to warrant granting him compassionate release.  Yet, this does not

forestall finding extraordinary and compelling reasons to grant Defendant's Motion.  See Russo, 2022 WL 17247005, at *6 (finding defendant's "heightened risk of COVID-19 may not alone suffice as an extraordinary and compelling reason, [but that] in combination with the other factors, it weighs toward granting a reduction"); Watts, 2023 WL 35029, at *9 (acknowledging "nationwide reports that being fully vaccinated does not completely eliminate the risk and dangers of contracting COVID-19, as variants, breakthrough infections, and infection rates have risen in multiple waves, even where a patient has received boosters" and finding risks to defendant's health from COVID-19 is, in combination with other factors, grounds for finding extraordinary and compelling circumstances warranting a sentence reduction).  Thus, while not an independent reason to do so, this factor tips in favor of granting a sentence reduction.

As to Harshness of Incarceration Caused by Pandemic: "Undoubtedly, 'a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.'"  Johnson, 2023 WL 3093617, at *10 (quoting United States v. Mcrae, No. 17-CR-0643, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021)).  Hence, "detention during the pandemic is 'essentially the equivalent of either time and a half or two times what would ordinarily be served.'"  Id. (citing United States v.

Elias, 579 F. Supp. 3d 374, 378 (E.D.N.Y. 2022); further citation
omitted).  Consequently, "particularly for defendants who have (i)
served long sentences and (ii) been detained for the entirety of
the pandemic," courts have been willing to conclude that "pandemic-
induced conditions of confinement can constitute extraordinary and
compelling circumstances warranting compassionate release."  Id.
(quoting Oquendo, 2023 WL 199609, at *5, and collecting cases);
see also Russo, 2022 WL 17247005,, at *6 ("In addition to the
health risks posed by the pandemic, the restrictions at [federal
correctional   facilities]   during   the   pandemic   have   made
[defendants'] incarceration[s] much more punitive than originally
contemplated at the time of sentencing[s]." (citing United States
v. Rodriguez, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)); United
States v. Hatcher, No. 18-CR-0454, 2021 WL 1535310, at *3 (S.D.N.Y.
Apr.  19,  2021  ("[C]ourts  reviewing  motions  for  sentence
modifications  have  considered  the  extent  to  which  onerous
lockdowns and restrictions imposed by correctional facilities
attempting to control the spread of the virus have made sentences
'harsher and more punitive than would otherwise have been the
case.'" (quoting Rodriguez, 492 F. Supp. 3d at 311, and collecting
cases)).

        Here, Defendant was incarcerated at FCI Seagoville, a
correctional facility that was particularly hard-hit by the
Pandemic requiring it to operate at Level 3 with the most sever

restrictions.  (See Motion at 21-22, Suppl. Motion at 7.)  See also, e.g., United States v. Arceo, No. 5:09-CR-0616, 2020 WL 4001339 (N.D. Cal. July 15, 2020) (stating Seagoville was, at the time, "battling one of the most serious COVID-19 outbreaks in the nation" and had "the highest number of positive inmates of all the federal prisons").  According to Defendant, among other things, it was nearly impossible to socially distance, there was a lack of enforcing mask-wearing policies, no hand-sanitizer was available (see Motion at 21-22), and he has been subjected to months of lockdowns and "a lack of access to programming." (Id. at 18.)  He has been detained at Seagoville for the entirety of the Pandemic.  Thus, as the Russo Court observed, this Court finds that while the severe restrictions imposed during the Pandemic were "aimed at protecting inmates from illness," they also had "an indisputably punitive effect;" hence, the harshness of COVID-related restrictions weigh in favor of a sentence reduction even if they do not independently constitute an extraordinary and compelling reason to grant compassionate release.  2022 WL 17247005, at *6; see also Oquendo, 2023 WL 199609, at *5-6 (finding the length and totality of the Pandemic-induced conditions-of-confinement to which defendant was subjected -- where defendant served a long sentence and had been detained for the entirety of the Pandemic -- constituted an extraordinary and compelling circumstance under Section 3582(c)(1)(A)(i)).

As to the Length of Sentence: Acknowledging the seriousness of his crimes, Defendant nonetheless persuasively argues that his 32-year sentence of incarceration is harsh and excessive when compared to sentences imposed today for similar crimes. (See Motion at 24.) Indeed, he highlights that in 2019 in the Southern District of New York, the median sentence for firearms cases was 60 months' imprisonment and the median sentence for robbery cases was 48 months' imprisonment, significantly lower than the 384-month sentence he is currently serving. (See id. at 24-25 (citing U.S.S.C. Sourcebook)). Compare Monteleone, 2023 WL 2857559, at *5 ("[I]t is worth noting that the national average for a murder conviction is closer to 20 years." (citing United States v. Qadar, No. 00-CR-0603, 2021 WL 3087956, at *12 (E.D.N.Y. July 22, 2021) (average federal murder sentence in fiscal year 2020 was approximately 21 years)). Defendant further asserts that if sentenced today, he would no longer be subject to having his offenses "stacked" under 18 U.S.C. § 924(c)(1)(C) as occurred when he was sentenced in 2007. (See id. at 25.) He argues courts have "found that the unjust practice of 'stacking' sentences that resulted in excessively long sentences have established extraordinary and compelling reasons justifying compassionate release." (Id. (citations omitted).) Relatedly, Defendant points to cases of more grave crimes where defendants were granted compassionate release. (See id. at 25-26 (collecting cases).)

The Government has not responded to Defendant's stacking argument.  (See Opp'n, in toto.)  Rather, in the context of addressing the Section 3553(a) Factors, the Government maintains Defendant "continues to present a danger to the community and should be required to serve the sentence that this Court imposed for his criminal conduct." (Id. at 8, 10.)  It relies solely upon the PSR used to impose Defendant's sentence in advancing this position.  (See id. at 8-9 (citing PSR, passim).)  The Government also advances the argument that a reduction in Defendant's sentence would undermine its intended deterrent effect.  (See id. at 10; see also Med. Update Response at 2 (same).)

"Courts in many districts—including this one—have found that an overly long punishment imposed under the obsolete § 924(c) stacking provision constituted an extraordinary and compelling reason for sentence reduction."  Watts, 2023 WL 35029, at *9 (quoting Reid, 2021 WL 837321, at *5 (collecting cases)) (further relying upon disparity of defendant's stacked sentence compared to sentences of "other defendants nationwide who have committed equally or more serious offenses" as an extraordinary and compelling reason to reduce sentence); see also id. at *10 (taking "judicial notice of the United States Sentencing Commission . . . statistics, which indicate that in 2021, the average national sentence imposed for equally or more serious crimes than [defendant]'s were as follows: the crime of robbery, 104 months (6

years, 9 months); for murder, 244 months (20 years, 4 months); for child pornography, 108 months (9 years); for sexual abuse, 211 months (17 years, 6 months); and for kidnapping, 166 months (13 years, 9 months)" (citation omitted); see generally United States v. Kissi, 469 F. Supp. 3d 21, 38 (E.D.N.Y., 2020) (generally agreeing "that where Congress has amended laws impacting mandatory minimum sentencing, for particular defendants, those changes may create an unwarranted disparity between the sentences they received and the sentences similarly situated defendants would receive today" and such "unwarranted disparity may in turn constitute an extraordinary and compelling circumstance under section 3582(c)"). Even putting aside Defendant's stacking argument, but see United States v. Campbell, No. 20-4202-CR, 2022 WL 199954 (2d Cir. Jan. 24, 2022) (discussing the change in law brought about by the First Step Act eliminating the "stacking" of § 924(c) convictions and that such change may be considered an extraordinary and compelling circumstance warranting a sentence reduction), the Court finds merit in Defendant's argument that if he were sentenced today, his sentence would not be as lengthy as the one imposed in November 2007, especially when considering contemporary sentences imposed for armed robbery as well as less lengthy sentences imposed for more egregious crimes. See, e.g., United States v. Haynes, 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (in granting compassionate release, considering as one of several

extraordinary and compelling circumstances the harshness of defendant's sentence "as compared to the sentences imposed on similar and even more severe criminal conduct today"). Moreover, as discussed above, the harshness of Defendant's sentence has been compounded by his having been incarcerated during the entirety of the COVID-19 Pandemic. See, e.g., Russo, 2022 WL 17247005, at *6 (stating restrictions at federal correctional facility during COVID-19 Pandemic made defendant's "incarceration much more punitive than originally contemplated at the time of sentencing" (citation omitted)). That, in tandem with the excessive length of Defendant's sentence, presents an extraordinary and compelling circumstance warranting a sentence reduction.

As to Rehabilitation Efforts: While well-settled that rehabilitation efforts alone cannot form the basis for granting a sentence reduction under the First Step Act, in conjunction with other considerations, it may weigh in favor of finding extraordinary and compelling reasons to grant relief. See Brooker, 976 F.3d at 237-38. Such is the case here.

Impressively, in his more than 18 years of incarceration, Defendant has not had any disciplinary infractions. (See Motion at 26.) Moreover, Defendant has spent his time in prison "taking every class that is available to him." (Id. at 27.) Indeed, the Court agrees that Defendant's "selection of coursework" demonstrates his desire to rehabilitate himself as a

"productive and law-abiding individual". (Id.) Defendant's claim of rehabilitation is underscored by his letter to the Court. (See Ex. E, ECF No. 111-2 at ECF pp.1-5, attached to Motion.) Among other things, Defendant: takes full responsibility for his crimes; is "ashamed and embarrassed" for his past actions; is "truly very sorry for them" and "truly regret[s] the pain, hurt, trauma, and suffering that [he] caused others because of [his] selfishness"; and asserts not to be "the same person who was sentenced to prison" but is a "new, transformed person" who is "remorsefully sorry" for his past actions. (Id.) Contra United States v. Siraj, No. 05-CR-0104, 2023 WL 2569398, at *3 (E.D.N.Y. Mar. 20, 2023 (in assessing defendant's rehabilitation claim, finding an "otherwise exemplary record of rehabilitation" to be "undermined" where defendant did not accept responsibility for his crime, but attempted "to shift blame for extraordinarily serious conduct and to relitigate the underlying facts of [the] case"). Relatedly, Defendant's rate of recidivism has been determined to be low. (See Motion at 28 (citing BOP Male Pattern Risk Scoring[5]).) The combination of these factors, which the Government does not address (see Opp'n, in toto), weighs in favor of finding extraordinary and compelling circumstances warranting granting Defendant a sentence

---

[5]   Incorrectly cited as "Ex. J" attached to Defendant's Motion. The Male Pattern Risk Scoring sheet is actually "Ex. I" (ECF No. 111-2 at ECF pp.34-35) attached to Defendant's Motion.

reduction.  As Judge Frederic Block of this District aptly stated,
the First Step Act "provides a powerful incentive for good behavior
during long terms of incarceration, making clear that meaningful
rehabilitation is a prisoner's best chance at obtaining a second
chance at living a law-abiding life."  Russo, 2022 WL 17247005, at
*12.

D.   The Section 3553(a) Factors

"The court confronted with a compassionate release
motion is still required to consider all the Section 3553(a)
[F]actors to the extent they are applicable, and may deny such a
motion if, in its discretion, compassionate release is not
warranted because Section 3553(a) [F]actors override, in any
particular case, what would otherwise be extraordinary and
compelling circumstances."  Gotti, 433 F. Supp. 3d at 615.

> These factors include "the nature and
> circumstances of the offense and the history
> and characteristics of the defendant," as well
> as the need for the sentence imposed "to
> reflect the seriousness of the offense, to
> promote respect for the law, and to provide
> just punishment for the offense;" "to afford
> adequate deterrence to criminal conduct;" "to
> protect the public from further crimes of the
> defendant;" and "to provide the defendant with
> needed educational or vocational training,
> medical care, or other correctional treatment
> in the most effective manner."  18 U.S.C.
> § 3553(a)(1)-(2).  A court must also consider
> "the need to avoid unwarranted sentence
> disparities among defendants with similar
> records who have been found guilty of similar
> conduct."  Id. at § 3553(a)(6).

Johnson, 2023 WL 3093617, at *12 (E.D.N.Y., 2023).   "However, a
court is not required to consider disparities between co-
defendants."   Id. (citing United States v. Frias, 521 F.3d 229,
236 (2d Cir. 2008) ("We have held that section 3553(a)(6) requires
a district court to consider nationwide sentence disparities, but
does not require a district court to consider disparities between
co-defendants." (citing United States v. Wills, 476 F.3d 103, 109-
11 (2d Cir.2007))); United States v. Medina, 607 F. App'x 60, 61
(2d Cir. 2015) (Summary Order)).

Here, the Section 3553(a) Factors[6] do not override the
cumulative effect of the extraordinary and compelling
circumstances Defendant presents warranting granting compassionate
release.   First, notwithstanding that the spree of armed robberies
that led to Defendant's conviction were serious crimes, given:
Defendant takes full responsibility for his crimes, for which he
expresses profound regret, shame, and embarrassment; the extent of
Defendant's chronic co-morbidities, especially his Type II
diabetes, which he struggles to manage in prison, is worsening,
and impedes his balance and ability to ambulate (see, e.g., Motion
at 29); the harshness of Defendant's incarceration caused by the

---

[6]   "Many of the applicable [Section] 3553(a) [F]ctors are
incorporated in the Court's discussion of extraordinary and
compelling circumstances." United States v. Campbell, No. 91-CR-
1219, Mem. & Order (ECF No. 822), at 18-19 (E.D.N.Y. Oct. 21,
2022).

COVID-19 Pandemic, which subjected him to a level of punishment not envisioned or intended when imposed; Defendant's stellar disciplinary record, in concert with his impressive rehabilitative efforts and low rate of recidivism, assuages concerns regarding Defendant's dangerousness to the community.  Similarly, these considerations debunk the Government's contention that "[D]efendant's age and medical condition would not compromise his ability to recruit a willing participant to commit or assist him in committing violent acts on his behalf." (Opp'n at 10.)  Second, even a sentence of time served in this instance remains a significant sentence that meets the goals of general and specific deterrence.  Moreover, as Defendant was incarcerated under harsh conditions during the entirety of the COVID-19 Pandemic, even with a reduction in his sentence to time served, Defendant will be subject to a "justified punitive sanction" for his crimes.  (Id.) Finally, the Court finds a sentence of time served in this instance ensures continued respect for the law; it is sufficient, but not greater than necessary to satisfy the statutory sentencing objectives in this case.  In sum, "[t]his sentence appropriately promotes respect for the law, provides just punishment, adequately deters criminal conduct, protects the public from the [D]efendant, and avoids unwarranted sentencing disparities, satisfying the principal factors to be considered under 18 U.S.C. § 3553(a)." Russo, 2022 WL 17247005, at *9.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Compassionate Release Motion (ECF No. 111) is GRANTED to the extent Defendant's sentence of imprisonment is reduced to time served, and thereafter, the original three-year period of supervised release shall commence.

**IT IS FURTHER ORDERED** that this Superseding Order is STAYED for up to 14 days from the date of its issuance

> for the verification of the [D]efendant's residence, establishment of a release plan . . . , and to make appropriate travel arrangements. The [D]efendant shall be released within [14] days, as soon as a residence is verified, a release plan is established, and appropriate travel arrangements are made. There shall be no delay in ensuring travel arrangements are made. If more than [14] days are needed to make these preparations, the parties shall immediately notify the [C]ourt and show cause why the stay should be extended.

Johnson, 2023 WL 3093617, at *12.

**SO ORDERED.**

 /s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   July 12, 2023
         Central Islip, New York

Page 32 of 32